**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Chief Judge Marcia S. Krieger**

Civil Action No. 13-cv-00769-MSK-KMT

**GENERAL STEEL DOMESTIC SALES, LLC, doing business as General Steel Corporation,**

      **Plaintiff,**

v.

**ETHAN DANIEL CHUMLEY;**
**ATLANTIC BUILDING SYSTEMS, LLC, doing business as Armstrong Steel Corporation;**
**GOTTFRID SWARTHOLM;  and**
**PRQ INTERNET KOMMANDITBOLAG (LIMITED PARTNERSHIP), doing business as PRQ Inet KB;**

      **Defendants,**

v.

**JEFFREY KNIGHT,**

      **Third-Party Defendant.**

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court on the Objections of Defendants Atlantic

Building Systems, Inc. and Mr. Chumley (collectively, "Armstrong") **(# 336)** to the Magistrate

Judge's July 30, 2014 Minute Order **(# 306)** denying, in part, Armstrong's Motions to Compel

**(# 212, 226)**, the Plaintiff's ("General") response **(# 365)**, and Armstrong's reply **(# 372)**;

General's Motion for Summary Judgment **(# 486, 490)**, Armstrong's response **(# 495, 498)**, and

General's reply **(# 507, 509)**; Armstrong's Motion for Summary Judgment **(# 488)**, General's

response **(# 493)**, and Armstrong's reply **(# 508)**; and General's Motion to Restrict Access

(**# 516**).

## FACTS

The Court briefly summarizes the pertinent facts here and elaborates as appropriate in its analysis.

According to the Amended Complaint (**# 101**), General is a company engaged in the sale and distribution of prefabricated steel buildings.  It briefly employed Defendant Ethan Chumley, but terminated his employment in July 2005.  Mr. Chumley then founded Defendant Atlantic Building Systems, Inc., a business that also engages in the sale and distribution of prefabricated steel buildings in direct competition with General.

In June 2011, Mr. Chumley purchased the internet domain name generalsteelscam.com, and began hosting a website on it that, General contends, contained false and defamatory material directed at General and its employees.  (The website is registered overseas through Defendants PRQ and its principal, Mr. Swartholm, although General contends that Mr. Chumley maintains control over it.)   General filed a complaint with the international agency that oversees domain name disputes and was successful in securing a ruling that required Mr. Chumley to turn over the generalsteelscam.com site to General.  Mr. Chumley then registered a new domain, steelbuildingcomplaints.com, which General contends repeats the defamatory content that the predecessor website did.

Mr. Chumley promotes steelbuildingcomplaints.com through a process known as "back-linking."  In essence, he (or, more accurately, his agents) creates hundreds or thousands of placeholder websites that consist primarily of links containing variations on the name "General Steel," all of which link back to steelbuildingcomplaints.com or to web pages belonging to Armstrong.  The practice of back-linking is designed to manipulate the page-ranking algorithms

of search websites such as Google and Bing in order to increase the prominence that the steelbuildingcomplaints.com website will have in search results when a user searches using the terms "General Steel" or its variants.  (The practice is also known as "Search Engine Optimization" or "SEO.")  General contends that the prominent placement of steelbuildingcomplaints.com in search results for "General Steel" operates to discourage potential General customers.  Mr. Chumley also allegedly purchases advertising space from search companies, so that user searches for "General Steel" or its variants result in the display of ads for Armstrong.

In December 2012, Mr. Chumley allegedly began calling General's customers, purporting to be an investigator with the Colorado Attorney General's Office, inviting the customers to file complaints against General.  Mr. Chumley also allegedly sent letters to General's customers from the "Consumer Advocacy Alliance – General Steel Investigation Unit," a fictitious entity, inviting customers to file claims or complaints against General.

Based on these allegations, General asserts six claims: (i) false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) against the Defendants; (ii) violation of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), against Armstrong, relating to the registration and use of the generalsteelscam.com website; (iii) common-law libel against Armstrong; (iv) unjust enrichment against Armstrong; (v) civil conspiracy against Armstrong; and (vi) misappropriation of trade secrets, in violation of C.R.S. § 7-4-101 *et seq.* against Armstrong, relating to these Defendants acquiring and using General's "valuable customer information" and "customer lists and/or databases."

Armstrong filed an Answer **(# 117)** in which it asserted counterclaims against General and third-party claims against Jeffrey Knight, General's principal.  Armstrong alleges that

General maintains a network of websites containing "blatantly false and misleading advertisements, stories, testimonials" and other materials promoting General, including false representations that General (and its subsidiaries) actually manufacture steel buildings, that General was founded in 1928 (rather than in 1995, as Armstrong contends), that it manufactures and supplies steel to the U.S. military and auto industry, and so on.  (Armstrong contends that, in doing so, General is appropriating the history and corporate identity of General Steel Industries, Inc., a longstanding-but-unrelated entity.)  Armstrong contends that, through these false representations, General induces customers to patronize it instead of its competitors. Armstrong also alleges that General's own website contains false or misleading promotional information, including references to it repeatedly receiving "Best In the Industry Awards" that do not actually exist, or falsely identifying prominent companies as being General's customers.

Armstrong also alleges that General has misappropriated Armstrong's trademarked logo. In certain electronic brochures, General includes a modified version of Armstrong's logo, replacing the phrase "Armstrong Steel" with the phrase "Fraudulent Steel."  Armstrong contends that General also uses Armstrong's mark on its various affiliated websites, such as in advertisements displaying Armstrong's logo and reading "buy an Armstrong Steel building!"; in actuality, these advertisements, when clicked, redirect the user to General's website.  (Armstrong also alleges that it also holds a copyright on the logo, and that General's use of the logo also constitutes copyright infringement.)

Armstrong asserts two claims: (i) copyright infringement, in violation of 17 U.S.C. § 501 *et seq.*, against both General and Mr. Knight; and (ii) false advertising, in violation of 15 U.S.C. § 1125(a)(1)(B), against both General and Mr. Knight.

General **(# 486)** and Armstrong **(# 488)** both seek summary judgment on the claims asserted against them.  The Court will address the specific arguments raised in those motions more completely below.  Separately, there appears to be an outstanding discovery dispute, in which Armstrong filed Objections **(# 336)** pursuant to Fed. R. Civ. P. 72(a) to an order by the Magistrate Judge denying Armstrong's motions to compel **(# 212, 213, 226)** responses to certain interrogatories.

## ANALYSIS

### A.  Discovery issue

The Court begins with Armstrong's Objections to the Magistrate Judge's ruling.  At issue are three interrogatories posed by Armstrong to General: (i) "Interrogatory 2," a request for the "names, home address, and home telephone and cell number" of "all individuals employed by General Steel in an administrative or sales position" from 2009 to 2013; (ii) "Interrogatory 10," a request for the names, address, and telephone number of "every customer who complained about alleged misrepresentations and/or deceptive or fraudulent advertising or practices by General Steel" from 2009 to 2013; and (iii) "Interrogatory 1," a request that "with respect to the screen shots disclosed by [Armstrong]" in Armstrong's own production, that General state whether the "such screen shot was authored and/or posted on the internet either by General Steel or its agents," that it "state . . . the identification of all letters, facsimiles, and emails between General Steel and its employees  regarding such advertising, customer testimonials or blogs"; that it "state . . . the identification" of the same information as between General and "third parties"; that it "state . . . the identification of any false information or fabricated customer testimonials or blogs with regard to General Steel  . . ., General Steel's charitable contributions, industry awards given to General Steel, and the number or identity of General Steel's current or former

customers"; and that it "state . . . the identification of all reports" concerning "the traffic and/or number of links from such advertising to [a list of specific websites]."

General refused to answer the interrogatory concerning its employees on grounds of relevance, produced certain records of customer complaints incident to a prior ruling of the Court but opposed producing the remainder as irrelevant and overly burdensome, and opposed the third interrogatory as vague, overbroad, unduly burdensome, and compound.

Armstrong moved to compel (# 212, 213, 226) responses to these interrogatories. The Magistrate Judge heard those motions, among many others, on July 30, 2014 (# 306). According to the transcript of that hearing (# 259), the Magistrate Judge denied the motions with regard to Interrogatory 1 without hearing any argument from the parties; she merely stated "I think it's way overbroad. I'm not going to have the plaintiffs going through 9,419 pages looking at stuff that's clearly irrelevant to respond to it. So that is - - that's denied on the fact that it's overbroad." Similarly, as to Interrogatories 2 and 10, the Magistrate Judge denied the motions without hearing argument, simply stating "General Steel's objections are sustained on all of the other issues that were raised. I think [these] interrogatories . . . are uniformly overbroad, irrelevant, and a blatant fishing expedition to obtain information about a competitor for purposes unrelated to the case." Armstrong then filed the instant Objections (# 336) to that ruling.

Rulings on non-dispositive issues by a Magistrate Judge are reviewed by this Court pursuant to Fed. R. Civ. P. 72(a), and will be reversed only if they are "clearly erroneous or contrary to law."[1] 28 U.S.C. § 636(b)(1)(A); *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir.

---

[1]      Armstrong argue that because the Magistrate Judge's explanation for her ruling did not contain any meaningful discussion of her rationale, her "bare conclusion is beyond meaningful judicial review," warranting this Court reviewing the motions to compel *de novo*. *Citing Hirsch v. Zavaras,* 920 F.Supp. 148, 149 (D.Colo. 1996). This Court finds the rationale of *Hirsch* – which analogizes a Magistrate Judge's ruling on discovery disputes to the type of "findings

1997); *Ariza v. U.S. West Communications, Inc.*, 167 F.R.D. 131, 133 (D. Colo. 1996).

Accordingly, Armstrong's Objections will be overruled unless the Court finds that the Magistrate

Judge abused her discretion or, if after viewing the record as a whole, the Court is left with a

"definite and firm conviction that a mistake has been made." *Ariza,* 167 F.R.D. at 133, *citing*

*Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1464 (10th Cir.1988).

The Court finds no clear error or incorrect application of law in the Magistrate Judge's

ruling.  It agrees with the Magistrate Judge that Armstrong's request in Interrogatory 2 for the

names, addresses, and phone numbers of all of General's sales and administrative employees is

indeed overbroad and a "fishing expedition."  Armstrong argues that it "could contact former

employees informally to determine whether they had any knowledge or information about"

General's allegedly false statements, or that it could use the list of employees "to refresh a

deponent's mind[ ] about whether there were other employees that might have knowledge about

the topics above."  Armstrong is free to inquire of General's witnesses about the identities of

other employees at General who might have knowledge of particular statements by General, but

a wholesale request for the identities of <u>all</u> of General's employees in certain categories, simply

in the hopes that interviewing them might lead to additional discoveries, is indeed an overbroad

request properly characterized by the Magistrate Judge as a fishing expedition.[2]

---

supported by specific weighing of evidence" that ALJs are required to provide – to be
unpersuasive.

    In any event, were the Court to accept Armstrong's invitation to consider the motions to
compel *de novo*, it would nevertheless reach the same conclusions as set forth herein.

[2]     Armstrong also argue that <u>it</u> produced a list of all of its own sales and administrative
employees in response to a request from General, and that General should thus be obligated to
reciprocate.  This argument lacks merit.  It is no more than the adult version of the child's
request for "tit for tat".

Interrogatory 10 presents a somewhat closer question.  Armstrong requested information about customers who complained to General about "alleged misrepresentations and/or deceptive or fraudulent advertising or practices" by General over a certain time frame (along with certain subsidiary information relating to each complaint).  Facially, this request might be pertinent to a claim by Armstrong  that  General has engaged in false advertising by representing on its website that it has a history of "100% customer satisfaction" and "zero unresolved customer issues." However Interrogatory 10 is limited to specific <u>types</u> of complaints that it seeks - only complaints in which a customer has complained to General about "misrepresentations" or "fraudulent advertising" by General.  In a previous discovery request, Armstrong already obtained discovery of all customers who complained about General increasing prices on customers after entering into a contract with them (and abandoned a request for discovery of more general customer complaints concerning the quality of General's products).  *See generally* **(# 179)**.

The Court finds that the Magistrate Judge did not err in denying Armstrong's motion to compel the information requested in Interrogatory 10.  Armstrong's request is predicated on General's advertising that it has a history of "100% customer satisfaction" and "zero unresolved customer issues."  The most reasonable readings of those advertising messages is that General is asserting that its customers are completely satisfied with the <u>products and services</u> that General provides, not a representation that General's customers are satisfied with General's <u>advertising</u>. (Arguably, there may be customers who purchased a particular product or service from General because of General's advertising, only to be dissatisfied with the result, but once again, that dissatisfaction would ultimately trace back to the quality of General's products or services.) Thus, the universe of customer complaints that would disprove General's promotion of complete

customer satisfaction would be comprised primarily of customers who were dissatisfied with the products and services General delivered, not customers whose sole basis of complaint to General was about its advertising.  In such circumstances, it would not be inappropriate for the Magistrate Judge to conclude that the probative value of customer complaints about advertising have relatively little probative value.  The record as a whole reflects that General had previously established that complying with a request of this type would require it to search more than 2,000 customer files, most of which are kept solely in paper form.  Under the circumstances, where the probative value of the requested information is fairly low and the burden of producing it was significant, it was not inappropriate for the Magistrate Judge to deny the motion to compel a response to such an interrogatory.

Finally, the Court agrees with the Magistrate Judge that no response to Interrogatory 1 was required.  Besides being clearly compound (requests for information about General's charitable contributions have no apparent connection to requests about General's web traffic data, which has no apparent connection to the identity of the author of various web pages, among others) and occasionally incomprehensible, the interrogatory is overbroad.  It is apparently undisputed that the "screen shots" that the interrogatory inquires about consists of nearly 10,000 pages containing approximately 14,000 individual articles or blog posts.  Although it may be appropriate for Armstrong to inquire about the authorship of particular documents that contain particular false representations allegedly made by or on behalf of General, it was appropriate for the Magistrate Judge to conclude that some 10,000 requests of this type were overbroad.  For example, in Armstrong's reply in support of their Objections, it tenders a 7-page sample of the articles and blog posts that are the subject of Interrogatory 1.  Of the six articles shown, four are highlighted to indicate that the primary objectionable content of the article is a reference to

9

General being a "manufacturer" of steel buildings.  If Armstrong's intention is to show that

General falsely advertised itself as a "manufacturer" of steel buildings, it might be appropriate

for it to select several examples of General doing so and inquire about the authorship, etc. of

those exemplars; it is a different matter to require General to identify the author of more than

10,000 separate articles, many of which are likely to be effectively identical.  Such a request is

clearly overbroad.  Although the Magistrate Judge could have exercised her discretion to require

Armstrong to cull its request to a manageable size, her decision to deny the motion to compel

outright on the grounds of overbreadth and burdensomeness was not an abuse of her discretion.

Accordingly, the Court overrules Armstrong's Objections and affirms the Magistrate

Judge's denial of its motions to compel.

**B.  Summary judgment motions**

**1.  <u>Standard of review</u>**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if

no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

Summary adjudication is authorized when there is no genuine dispute as to any material fact and

a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs

what facts are material and what issues must be determined.  It also specifies the elements that

must be proved for a given claim or defense, sets the standard of proof and identifies the party

with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## 2. **General's motion**

The Court begins with General's motion, which seeks summary judgment on Armstrong's counterclaims.[3]

---

[3]    Notably, the motion is asserted only by General. The Court does not understand Mr. Knight to be seeking summary judgment on the third-party claims against him by Armstrong.

a. <u>False advertising</u>

Armstrong's counterclaim against General for false advertising is asserted under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). That statute prohibits "any person who, on or in connection with any goods or services . . . uses in commerce any  . . . false or misleading description of fact . . . which in commercial advertising of promotion misrepresents the nature, characteristics, qualities or geographic origin of his or her or another person's goods, services, or commercial activities."  Armstrong contends that General made numerous false representations of fact in numerous contexts: (i) that it made thousands of "blog posts" or published content on internet web sites falsely representing that it was a "manufacturer" of steel buildings, that it has been in existence for more than 50 years, that it supplied steel to the U.S. military during World War II, and so on; (ii) that it sponsored "pay-per-click" advertisements on search engines that stated that it was a manufacturer of steel buildings; (iii) that it created internet "directory listings" that identify it as a manufacturer of steel buildings; (iv) that it made various false statements on its own website to the effect that it had a "history of 100% customer satisfaction" and "zero unresolved customer issues" and published customer testimonials containing false material; (v) that it published an electronic "brochure" entitled "Fraudulent Steel" that ....; and (vi) that its customer representatives made various false representations about General and Armstrong.[4]

---

[4]     The Court summarily disposes of several of these contentions at this stage.  Armstrong's response brief contains no substantial citations identifying the offending customer testimonials (much less clearly identifying any falsehoods contained therein), relying instead on a brief deposition excerpt that only vaguely discusses those testimonials.  Accordingly, the Court will not consider the customer testimonials further.

The Court also disposes of any contentions relating to the directory listings.  Although Armstrong contends that these listings represented that General is a "manufacturer" of steel buildings, the handful of citations to examples of these listings state merely that General offered

To establish a Lanham Act claim such as this, Armstrong must show: (i) that General made materially false or misleading representations of fact; (ii) in connection with its commercial advertising; (iii) in commerce; (iv) that such representations were likely to cause confusion or mistake as to the characteristics of its goods or services; and (v) that such use caused injury to Armstrong. *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1140 (10th Cir. 2006).

### (i) Agency

It is undisputed that the content comprising the allegedly false "blog posts" and "pay-per-click" ads were not created by General itself.  Rather, General contracted with an entity called JEMSU (or sometimes "Denver SEO") by which JEMSU performed "search engine optimization" designed to heighten General's ranking in internet search engines like Google and Bing.  "Search engine optimization" services generally involve creation of hundreds or thousands of websites, each containing numerous short pieces of written content, generally no more than a paragraph or two, that link back to the  website being promoted.  Here, JEMSU's employees (or contractors it hires) wrote the pieces, each containing one or more links that point back to General's website.  The objective is for this network of websites to appear to the algorithms used by search engines to be legitimate, independent sources of content about General.  In this case, it is undisputed that, among the thousands of articles published by JEMSU on General's behalf are many that make a variety of false statements about General - that it manufactures steel, steel buildings, and products like automobile rims (when, in actuality, it manufactures nothing and only serves as a seller of others' products), that it has storied history

---

"prefab steel buildings by leading steel building manufacturers," not that it was itself such a manufacturer.

dating back more than 50 years (when, in fact, that history belongs to a different entity with a similar name), and so on.

General argues that JEMSU operated as an independent contractor, creating and publishing the content without any control or direction from General.  Thus, General argues, it cannot be held liable for any false representations contained in content published by JEMSU.

As a general rule, a master is subject to liability for torts[5] committed by its servant if the servant is acting in the scope of its designated authority; by contrast, a master is not typically liable for tortious acts committed by its servant if the servant is acting outside the scope of authority.  *See* Restatement (Second) of Agency, § 219.  General argues that JEMSU was not its agent/ servant, but rather was an independent contractor.  In determining whether a person or entity is a servant or independent contractor, the Court considers numerous factors, including: (i) the extent of control which the master may exercise over the work; (ii) whether the person performing the work is engaged in a distinct occupation; and (iii) whether the work is typically done under direction or completed independently, among several others.  Restatement (Second) of Agency, § 220.  The right of the master to control is the most important of these factors and is often determinative.  *Id.*  The Restatement explains that a right to control sufficient to create a master-servant relation can often appear attenuated, and may even arise where there is "an understanding that the employer shall not exercise control" over the other party.  It uses the example of the employer of a full-time cook - "the full-time cook is regarded as a servant although it is understood that the employer will exercise no control over the cooking". *Id.*; *also see also Western Fire Truck, Inc. v. Emergency One, Inc.*, 134 P.3d 570, 575 (Colo.App. 2006)

---

[5]      Acts such as false advertising are often characterized as being in the nature of torts.  *See e.g. Vector Products, Inc. v. Hartford Fire Ins. Co.*, 397 F.3d 1316, 1319 (11th Cir. 2005).

(critical inquiry is whether the <u>right</u> to control exists, not whether that right is actually exercised).

Importantly, the question of whether an agency relationship (*i.e.* master-servant) exists between

two parties is usually a question of fact).  The Court finds that, here, there is a genuine dispute of

fact as to whether JEMSU was acting as an agent of General when it published the allegedly

false content on General's behalf.

Turning first to the question of control, General contends that it did not (and, more

importantly, could not) attempt to control how JEMSU performed the creation and publication of

the web content, nor that it had control over the contents of the material JEMSU published.

General alleges that, beyond giving JEMSU instructions about not identifying General as a

"manufacturer" in the written content, it deferred entirely to JEMSU's expertise and exercised no

control over how JEMSU proceeded to perform the work.  However, there is evidence that

General had both the ability to exercise significant control over and direct JEMSU's activities,

and that it actually did so.  In a deposition, JEMSU's principal, Troy Olson, made it clear that if

asked by General, JEMSU "could . .  have put prohibitions on what [JEMSU] could publish

about them."  Presented with the hypothetical of General having instructed that "[when] you're

creating content . . . make sure you don't call us a manufacturer" and asked whether "that would

have been something that you all would have then tried to follow," Mr. Olson said "Yes."  Mr.

Olson acknowledges that it currently submits the content it intends to post on General's behalf to

General for approval prior to posting, and that General could have but did  request such review

previously.  Mr. Olson also acknowledges that, after October 2013 (when Armstrong filed the

counterclaims herein), General requested that JEMSU remove certain content it had posted on

General's behalf and that JEMSU did so.  The deposition of Travis McCain, an official of

General, corroborates that General expressly directed the actions of JEMSU on at least one

occasion:  after General discovered that a JEMSU employee had written false content about General manufacturing "steel rims" for vehicles, Mr. McCain "told [JEMSU] that they needed to evaluate everything that [the JEMSU employee] had written.  I told them that they needed to comb through all the content they've generated; and if they find anything like this, it needs to be rewritten to be content specific to the industry."

In many ways, JEMSU is analogous to the example of the full-time cook used in the example found in the Restatement.  As with the master employing the cook, General hired JEMSU to achieve a certain goal (preparing food; raising General's search engine profile). General may not have dictated the moment-to-moment or day-to-day activities of JEMSU, just as the master may not have directed the day-to-day activities of the cook, but both the master and General retained the authority to direct the charge. Indeed, there is evidence that General gave specific directions to JEMSU as to content.  Accordingly, there is a genuine dispute of fact as to whether JEMSU was acting as General's agent, rather than as an independent contractor, when publishing the false advertisements about General.

There is also a genuine dispute of fact as to whether General granted JEMSU the authority to publish the false content.  General contends that, when it retained JEMSU, Mr. McCain told JEMSU that "you could write anything that's truthful, [I] told them they weren't allowed to refer to General Steel as a manufacturer or a fabricator of buildings in any way, shape, or form.  But other than that, they were the experts and have at it."  Sean Hakes, who helped found JEMSU but who had left and was serving only as a consultant to it at the relevant time period, testified that he recalled Mr. McCain instructing JEMSU that it could not refer to General as a "manufacturer" of steel buildings, but that General never informed them that JEMSU should not refer to General as a manufacturer, or otherwise placed any limitations on the

content JEMSU would create (at least until October 2013, when the counterclaims were filed). Asked at his deposition "did General Steel tell you there was anything it did not want you to do?," Mr. Olson answered "Not to my recollection."  Later, he was again asked "did anyone before October 2013 tell you that General Steel was not allowed to say it was a manufacturer of steel buildings?," and Mr. Olson responded "After a, you know, search of my e-mail and thinking back, I don't recollect at all."[6]  He confirmed that "the first time [he] learned that it may be a problem for [his] content creators to say General Steel was a manufacturer" was "in October of 2013."

Taken in the light most favorable to Armstrong, Mr. Olson's testimony suggests that General retained JEMSU to post content for General's benefit, that General had the ability to dictate what types of content would and would not be acceptable to post, but that General granted JEMSU broad authority to post content on its behalf without giving JEMSU any instructions or stating any limitations on what JEMSU could write – that General simply told JEMSU to "have at it."  By authorizing JEMSU to post content about General without any boundaries or control, General effectively authorized JEMSU to publish whatever JEMSU desired.  Thus, there is a genuine dispute of fact as to whether JEMSU's posting of false information about General was an act undertaken by JEMSU within the scope of the authority delegated to it by General.

Accordingly, General is not entitled to summary judgment based on lack of agency.

---

[6]      Drawing inferences in favor of Armstrong on General's motion, the Court construes Mr. Olson's statements regarding his "recollection" as affirmative statements that the event being inquired about did not occur, rather than a statement by Mr. Olson that he is unable to remember whether the event may or may not have occurred.  There is a qualitative difference between "I don't remember that happening" and "I don't remember if that happened," and given the context and content of Mr. Olson's other answers, the Court understands Mr. Olson's statements to be more akin to the former.

(ii).   <u>The false representations as "advertisements"</u>

General argues that the false statements about it published by JEMSU cannot constitute "false advertising" under the Lanham Act because the content that was published was never intended to be read by humans.

To constitute "commercial advertising or promotion" under the Lanham Act, a factual representation must have four characteristics: (i) it must be "commercial speech"; (ii) it must be made by (or on behalf of) a defendant who is in commercial competition with the party asserting the Lanham Act violation; (iii) it must be "for the purposes of influencing consumers to buy defendant's goods or services" (whether part of a "classic advertising campaign" or in "more informal types of 'promotion'"); and (iv) it must be disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry. *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273-74 (10th Cir. 2000).

General contends that the bits of content published by JEMSU fail to meet the third and fourth elements of the test.  It argues that the content was not published "for the purpose of influencing customers" and was "not intended for human consumption" but rather was intended only to influence algorithms used by search engines.

The Court finds this argument unpersuasive.  The content published by JEMSU is not arbitrary or utterly irrelevant to General's operations – for example, it does not consist of links to General's website embedded in randomly-generated sentences, paragraphs from "Moby Dick," or even portions of generic, neutrally-phrased encyclopedia articles about the history and manufacture of steel.  The various examples in the record reveal, at least in most circumstances,[7]

---

[7]      The curious counter-example: an article entitled "Hand in the Cookie Jar" which introduces its titular metaphor and observes how "we like to take on more than we can handle." It quickly moves on to giving the example of "General Steel" (to which it links).  The article

that the authors purposefully created materials that were intended to appear as legitimate news

articles, reports, or testimonials about General and that frequently contained praise for General.

For example:

> • "General steel has you covered":  "I wish I still had a picture of the fifty year old grain silo that general steel [linked] built for my grand daddy back when he was running the family farm.  You could put that picture up to a picture of a grain silo built today and I tell ya, you'd be hard pressed to find a difference between the two. . .  Most people don't believe me but I tell them that general steel just knows their stuff and sometimes that is all you need to have a quality product that lasts and lasts . . . ."

> • "A big thank you to General Steel": "I am the CEO of the automotive manufacturing company and I would like to thank General Steel [linked] profusely for all their help.  It has been a long couple of years in the auto industry as there have been plant shut downs all around us . . . Luckily General Steel [linked] approached us with a new very cheap type of steel that could be used safely in cars. . . . After a few field tests we realized the technologies {sic} potential and immediately jumped at the opportunity. . . ."

> • "New Rims": "I just recently bought myself some new rims from General Steel [linked] and I love how they look.  I could not have asked for a better quality rim for my truck . . . I am glad I went by General Steel [linked] and saw that they had a good deal on rims because now I think my truck looks the best out of any I have seen. . . . ."

> • "Is it Seaworthy?": "I am the captain of a recently built ship and I believe that it will be one of the prettiest ships in the United States Navy.  Its hull was built with General Steel [linked] and is strong as it could possibly be.  This is important because if we ever go into battle, I want my ship to be the best out there. . . . I am going

---

explains that "General Steel was founded in 1928 after it bought a very successful steel company called the Commonwealth Steel Company," and goes on to briefly mention the activities of this company during World War II and its rapid expansion and acquisition of competitors in the 1950s and '60s.  It ends by stating "But soon after, General Steel's luck would run out.  Like the kid with his hand in the cookie jar, General Steel extended its hand too far for it to control and it slowly lost revenue.  General steel was in a lot of trouble by the 1970s because it did not care about the risks of reaching into the big cookie jar."

to try as hard as I possibly can to make myself into a better officer. The fact that our ship's hull is made from General Steel [linked] really helps my confidence out because I know that we are not going to sink."[8]

• "Growing with Companies Like General Steel": "When the general public hears about steel buildings from General Steel [linked] they often think of manufacturing plants or buildings used for agricultural purposes. . . . Interestingly, steel buildings are now being used more and more as aircraft hangars at smaller airports across the country. . . If you are in charge of a small, regional airport and are interested in a steel building, contact General Steel today to schedule a meeting with one of their advanced consultants. You will be able to go through all of the details to ensure that you are getting the most efficient services, no matter what the case might be for you."

These articles typically promote General as a business and are designed to engender positive associations between its name and quality products and services discussed by the authors. Just because the articles were drafted to influence algorithms  doesn't end the inquiry.   The ultimate purpose of the testimonials was to influence the algorithms to reflect the quantity and quality of favorable comments for the benefit of the ultimate consumer.  This is "promotional" information,  albeit filtered by electronic means. Conceptually, it could be "advertising" sufficient to support a Lanham Act claim.  The question becomes whether it reached the ultimate consumer.

This is a more difficult question.  Is there evidence that the false promotional information was disseminated to the consuming public in sufficient degree that the industry would consider such information to be "advertising." *Haugen*, 222 F.3d at 1273-74.   General asserts – and Armstrong does not dispute – that General/JEMSU never intended any human being to read the material JEMSU posted.  According to General, the intended "audience" for JEMSU's postings

---

[8]      The Court notes, with some amusement, that this article appears on a website named "Everyday Mommy," which features a logo of a cartoon cupcake and uses the tag line "Being a mom is a choice, and a full-time job!"

consisted entirely of automated search engine ranking algorithms.  Mr. Olson testified that an "incidental" amount of internet traffic accessed some of the JEMSU pages, but the record does not disclose who these individuals were, how many there were, or what their purpose in visiting the JEMSU pages was.

General cites to *Sports Unlimited, Inc. v. Lankford Enterprises, Inc.*, 275 F.3d 996, 1003-04 (10th Cir. 2002).  There, the plaintiff and defendant both sold and installed gym floors.  The plaintiff installed a gym floor for a customer, but the customer became unsatisfied with the product and contacted the defendant with certain questions.  At some point in time, the defendant created a document containing a list of some of the plaintiff's customers and (allegedly false) complaints by those customers. The defendant provided copies of the document to the contractor and architect on the project for the customer.  The customer eventually terminated its contract with the plaintiff and retained the defendant to replace the floor.  The plaintiff sued the defendant for false advertising under the Lanham Act, but the trial court granted summary judgment to the defendant, finding that the dissemination of the document to two individuals (or, arguably, as many as seven) was insufficient, as a matter of law, to constitute "advertising or promotion in the industry" under the Act, particularly when there was evidence that the plaintiff bid for as many as 150 jobs per year.  *Id.*  The 10th Circuit affirmed, explaining that although advertising in the form of "informal types of promotion" could support a Lanham Act claim and that "the extent of distribution necessary . . .may be an elastic factor, so that a relatively modest amount of activity may be sufficient in the context of a particular case," a plaintiff must nevertheless show "*some* level of *public* dissemination of the information."  *Id.* (emphasis in original).  The court concluded that distribution to "two persons associated with the same project" (a project, it noted,

had already been awarded to the plaintiff in the first instance), "simply does not, within the meaning of the Act, amount to commercial advertising or promotion." *Id.*

This Court finds *Sports Unlimited* instructive. It makes clear that to constitute an actionable advertising or promotional campaign, a dissemination of information must reach some numerically-significant quantity of actual or potential customers of the parties' products. This record is vague as to how many human beings might have encountered the material published by JEMSU. Mr. Olson describes that number as "incidental" and Armstrong does not clarify. Moreover, it is by no means clear that any of these "incidental" visitors were actual or potential customers of General's or Armstrong's products, or what information they actually reviewed. It is possible that the visitors reached the pages as a result of an internet search for information on steel buildings, but it is just as plausible that that they had no interest in steel buildings and arrived at the pages due to a coincidental search -- say, for information about navy battleships or the whereabouts of a high school classmate with the same name as a JEMSU article's ostensible author – or due to a typographical error. Armstrong provides no additional insight into the nature or quantity of the traffic reaching the JEMSU pages and thus, any conclusions the Court could reach about those matters would be sheer speculation.

Armstrong approaches the problem from a different perspective: it argues that, when a false advertising plaintiff demonstrates that a defendant's advertisement is "literally false" (as opposed to falsely implying a fact), courts do not require the plaintiff to show that the advertisement has an actual or potentially-deceptive effect on the consuming public, instead presuming that deception has occurred. *Citing Zoeller Laboratories,, LLC v. NBTY, Inc.* , 111 Fed.Appx. 978, 982 (10th Cir. 2004), *quoting Scotts Co v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002). This is a generally-correct statement of the law, but it begs the question of

whether the web content posted by JEMSU is "advertising".  As cases like *Sports Unlimited* suggest, publication of information does not become "advertising" until it reaches an audience of sufficient size.  Until that point, it is not "advertising" and it fruitless to discuss whether it has a deceptive effect.  Because Armstrong has not come forward with evidence that shows that the material posted by JEMSU reached sufficient numbers of customers of steel buildings to permit the conclusion that it was "advertising," General is entitled to summary judgment on the false advertising claims premised on the JEMSU "blog posts."

(iii) Pay-per-click advertisements

In addition to hiring JEMSU to perform search engine optimization services, General also retained JEMSU to handle certain types of more direct advertising.  Specifically, General, through JEMSU, purchased certain "pay-per-click" advertising from search providers.  It appears that, when users entered certain search terms on certain search providers, an ad for General would appear along with the search results, reading "The #1 Steel Building Manufacturer!  Call Toll Free: [phone number]."  It is undisputed that General is not a "steel building manufacturer," meaning that this advertisement is false.

General argues only that it cannot be liable for the false pay-per-click advertisements because they were created by JEMSU without General's knowledge, control, or authorization.  The Court need not repeat the analysis above; it is sufficient to observe that Mr. McCain's own deposition testimony seems to suggest that he, on behalf of General, reviewed the text of these advertisements:

> Q:  Do you review any of the pay-per-click ads that JEMSU is running on your behalf?
>
> A:  Yes.
>
> Q:  How often do you review those?

23

A:  Whenever they change.

Q:  Who creates the contents for your pay-per-click ads?

A:  What do you mean by content?

Q:  The ad text.

A:  JEMSU.

Q:  And you approve it?

A:  Yes.

Although General may contend that Mr. McCain is mistaken or unclear or that this testimony by him contradicts other testimony he gives, the Court must construe it in the light most favorable to Armstrong.  Thus, the Court finds that there is evidence in the record that Mr. McCain, on behalf of General, reviewed and approved the text of the pay-per-click advertisements that JEMSU was submitting on General's behalf, presumably including those that falsely identified General as a "manufacturer" of steel buildings.  Accordingly, a Lanham Act false advertising claim premised on these ads may proceed.

### (iv) General's own statements

In addition to JEMSU's efforts to market General, General promoted itself on its own website with content that Armstrong contends is false.  Specifically, Armstrong cites to: (i) a graphic reading "Awarded Best in the Industry 2007 – present," when, in fact, no such award exists; (ii) a statement that General has a "customer service track record of zero unresolved customer issues since the company was established"; and (iii) a statement that "No other steel building company can compete with our company's history of 100% customer satisfaction."  As to the latter two statements, Armstrong points out that General has been the subject of numerous complaints to the Better Business Bureau and has been sued by customers some 20 times.

General contends that these statements are either mere puffery or are so vague and non-specific that they cannot be considered "false" – in other words, without a generally-agreed upon definition of what "customer satisfaction" means or to whose satisfaction a customer complaint must be "resolved," one cannot affirmatively say that the representations are true or false.

"Puffery" consists of "exaggerated, blustering, and boasting statement[s] upon which no reasonable buyer would be justified in relying." *Hall v. Bed, Bath, and Beyond, Inc.*, 705 F.3d 1357, 1268 (Fed. Cir. 2013). The distinction between non-actionable puffing and actionable false advertising is "whether a reasonably buyer would take the representation at face value." *Id.* On the other hand, "specific and measurable claims and claims that may be literally true or false" are not puffery and can be considered actionable. *F.T.C. v. Direct Marketing Concepts, Inc.*, 624 F.3d 1, 11-12 (1st Cir. 2010).

Here, the Court agrees with General that the boast "Awarded Best in the Industry" is mere puffery, as no reasonable consumer would rely on such an assertion without first inquiring further into the nature and credibility of the entity granting the award. *See e.g. Hackett v. Feeney*, 2011 WL 4007531 (D.Nev. 2011) (a boast that a particular theatrical performance was "Voted #1 Best Show in Vegas," when no such "vote" ever occurred, was mere puffery).

But the Court agrees with Armstrong that the statements "zero unresolved customer issues" and "[a] history of 100% customer satisfaction" are specific, measurable claims that can be evaluated as true or false. They are not vague statements that elude quantification – *e.g.* "unparalleled customer satisfaction" or "complete customer satisfaction." Rather, they are statements of absolutes whose truth can be verified simply by ascertaining whether there are examples to the contrary: even a small number of dissatisfied customers or unresolved customer issues would suffice to demonstrate General's statement to be untrue. General argues that the

terms "customer satisfaction" and "unresolved customer issues" can be parsed and teased in various ways to make its statements true: that <u>General</u> considered customer complaints "resolved" even if the customer did not, or that a customer can be "satisfied" in some respects even if infuriated in others.  Such construction does violence to the ordinary meanings of those terms as they would be understood by reasonable consumers.  *See generally Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 250-51 ("there is and must be a point at which language is used plainly enough that the question ceases to be 'what does this mean' and becomes instead 'now that it is clear what this means, what is the legal consequence'").  A consumer encountering the phrase "a history of 100% customer satisfaction" in General's advertising would understand that phrase to mean that General endeavored to ensure that every customer of General was satisfied with every aspect of the product or service (or, at the very least, that every customer was, on balance, satisfied with a transaction as a whole even if the customer may have harbored some dissatisfaction with some aspect of it); a consumer encountering the phrase "zero unresolved customer issues" would understand that phrase to suggest that any customer encountering a problem with General's performance was ultimately able to reach a mutually-acceptable resolution of that issue with General.[9]

Because Armstrong has come forward with evidence that these statements are false – that certain customers never resolved their complaints with General and that many customers sued

---

[9]      General makes a novel argument that if a dissatisfied customer sues General over a transaction, the outcome of that suit  amounts to a "resolution" of the customer's complaint.  (In other words, if the resolution is unfavorable to the customer, the matter has been resolved by a conclusive finding that the customer's complaint was unfounded.  If the resolution is favorable to the customer and General is ordered to pay damages, the customer's receipt of the damages "resolves" the issue.)  A reasonable factfinder could conclude that the meaning of the promotional phrase "zero unresolved customer issues" is something far different than "we promptly pay off the damage awards when customers succeed in suing us."

General over unresolved issues – the Court denies General's motion for summary judgment on the false advertising claim as it relates to these assertions.

(v)  Damages

Finally, General argues that Armstrong cannot show that any specific customers had their purchasing decisions influenced by any of General's false advertising.  To establish the requisite element of causation and damages in a false advertising claim under the Lanham Act, a plaintiff must show that the false advertising caused consumers "to withhold trade from the plaintiff." *Lexmark Intern., Inc. v. Static Control Components*, *Inc.*, 134 S.Ct. 1377, 1391 (2014).

Once again, Armstrong tacitly concedes that it cannot demonstrate any <u>actual</u> damages it suffered that can be traced to General's false advertising.  Instead, Armstrong invokes a presumption of injury that can arise in certain circumstances.

Courts have sometimes approved a presumption of injury and causation in false advertising cases "upon a finding that the defendant deliberately deceived the public."  *Porous Media Corp v. Pall Corp.,* 110 F.3d 1329, 1333 (8th Cir. 1997).  However, such a presumption applies only where the defendant has engaged in false advertising that expressly compares the defendant's product to the plaintiff's; "where a defendant is guilty of misrepresenting its own product without targeting any other specific product, it is erroneous to apply a rebuttable presumption of harm in favor of a competitor."[10]  *Id.* at 1334, 1336.

Armstrong argues that the proposition enjoys a broader reach in the 10th Circuit.  It quotes *Hutchison v. Pfeil*, 211 F.3d 515 (10th Cir. 2000), for the proposition that "the presumption is properly limited to circumstances in which injury would indeed likely flow from the defendant's objectionable statements, i.e., when the defendant has explicitly compared its

---

[10]      *Porous* suggests that a lesser burden of showing causation might be appropriate where the only relief sought by a plaintiff is injunctive in nature.  110 F.3d at 1335-36.

product to the plaintiff's <u>or the plaintiff is an obvious competitor with respect to the misrepresented product</u>." *Id.* at 522 (emphasis added).  This statement from *Hutchinson* is *dicta*. The court in *Hutchinson* found that the plaintiff lacked standing to bring a Lanham Act claim because he was not a competitor of the defendant, and thus, the court was not required to determine whether a presumption of injury was appropriate.  *Id.* (noting that the presumption of injury "does overlap conceptually with the injury prerequisite for standing, and the presumption has been discussed, albeit rarely and unfavorably, in that connection," and ultimately concluding that "neither of these conditions exists here. Mr. Hutchinson's standing is deficient precisely because *he has no product* in competition with the Pfeils' painting") (emphasis in original).

Moreover, the proposition recited in *Hutchinson* is incomplete.  The 10th Circuit there cites to two cases, one of which is *Porous*, which, as mentioned above, describes the presumption of injury as applying only in circumstances of comparative advertising.  The other case cited by *Hutchinson* is *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir. 1994).  There, the court explained that "This circuit has adopted a flexible approach toward the showing a Lanham Act plaintiff must make on the injury and causation component of its claim."  It states that a plaintiff "need not demonstrate that it is direct competition with the defendant or that it has definitely lost sales because of the defendant's advertisements," but emphasizes that "the likelihood of injury and causation will not be presumed, but must be demonstrated in some manner."  *Id.*  It explains that "the type and quantity of proof required to show injury and causation has varied from one case to another depending on the particular circumstances," but observed that "we have tended to require a more substantial showing where

the plaintiff's products are not obviously in competition with defendant's products, or the defendant's advertisements do not draw direct comparison between the two."[11]  *Id.*

This Court understands the proposition stated in *dicta* in *Hutchinson* – that a presumption of injury can be drawn if the plaintiff and defendant are direct competitors regarding the product in question – as allowing a plaintiff who directly competes with a defendant to show an injury to itself with some lesser quantum of proof than a non-competitor might be required to show. However, it is still necessary for the competitor plaintiff to show <u>some</u> evidence of causation and injury, not to merely rely entirely on a presumption based on competition.  *See Ortho*, 32 F.3d at 694.   For example, in *Coca-Cola Co. v. Tropicana Products Inc.*, 690 F.2d 312, 316 (2d Cir. 1982), on which *Ortho* relies, the court repeated the same principles as *Ortho*, and then explained that, there, "[m]arket studies were used as evidence that some consumers were in fact misled by the advertising in issue. Thus, the market studies supplied the causative link between the advertising and the plaintiffs' potential lost sales; and thereby indicated a likelihood of injury."[12] *See also Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 259-60 (2d Cir. 2014) (repeating that in "non-comparative advertising [claims], the injury accrues equally to all competitors" and that "some indication of actual injury and causation would be necessary").

This Court rejects the notion urged by Armstrong that a Lanham Act plaintiff in direct competition with a defendant can rely entirely on a presumption of injury to obtain money damages, even when the advertising in question misrepresented only the defendant's product. *Porous* concisely explains why: in such a suit, the "plaintiff may be only one of many

---

[11]     *Ortho* ultimately concluded that the parties were not directly in competition with regard to the products at issue.

[12]     *Coca-Cola* involved an appeal of a denial of a preliminary injunction, which, as noted above, requires a lesser showing of injury to the plaintiff than a claim for damages might.

competitors, and without proof of causation and specific injury each competitor might receive a windfall unrelated to its own damage." 110 F.3d at 1336. To hold otherwise would permit <u>all</u> of General's and Armstrong's fellow competitors to pile on as well: they, like Armstrong, would lack any proof whatsoever of actual injury, but would merely rely on their status as competitors to presume that they, too, were injured by General. Nothing in the "presumption of injury" line of cases can be read to suggest that the Lanham Act intends to open the spigot of money damages to all competitors whenever one of their own promulgates a self-promoting advertisement containing a literal falsehood.

Because Armstrong relies exclusively on the presumption of injury, offering nothing more to demonstrate any non-speculative harm that it claims to have suffered, it is appropriate to grant summary judgment to General on Armstrong's Lanham Act counterclaim for false advertising to the extent it seeks money damages.[13]

### b. Copyright infringement

Compared to the sprawling false advertising claim, Armstrong's copyright infringement counterclaim is fairly narrow. Armstrong purports to hold the copyright on its logo, which consists of an image of a shield with the words "ARMSTRONG STEEL" emblazoned across it

---

[13]       As noted, a plaintiff seeking only injunctive relief has a lesser burden to show injury from a competitor's false advertising. However, it is unclear to the Court whether Armstrong would intend to press its false advertising counterclaim against General if the only remedy that it could obtain would be an injunction prohibiting General from: (i) falsely representing itself to be a manufacturer in pay-per-click advertisements, and (ii) falsely stating on its website that it has "100% customer satisfaction" and "zero unresolved issues." (Even if Armstrong would intend to press such a counterclaim, it is not clear whether General would voluntarily withdraw all manifestations of such advertising, thus rendering the issue moot.)  Within 14 days of the date of this Order, Armstrong shall file a notice either advising the Court that it continues to press the false advertising counterclaim solely for the purposes of obtaining the injunctive relief above or whether it is withdrawing any request for injunctive relief in conjunction with that claim.

above a yellow four-pointed star, all on a background consisting of a yellow-to-orange gradient. It alleges that General has infringed on that copyright in two respects.

First, General's website contains a link to a document described by the parties as an "e-brochure." That document begins with the text" Are you working with the best?  Or just another steel company?" and warns that "The internet is home to many companies offering a deal which is too good to be true," discussing certain unsavory tactics used by unspecified competitors of General.  A column along the left hand side of the document reads "IS THIS THE OTHER STEEL COMPANY?" and shows an image of a laptop computer displaying a shield logo with the words "FRAUDULENT STEEL" emblazoned on it above a yellow four-pointed star, all on an orange background.

The second form of infringement Armstrong asserts consists of at least one instance where a JEMSU-created blog contained an advertisement reading "Buy an Armstrong Steel Building!," accompanied by the actual Armstrong "shield" logo, a photograph of a building, and box reading "click here for more information."  It appears to be undisputed that a reader clicking on this advertisement would be taken to General's website, not Armstrong's.  Armstrong contends that this use of its shield logo, in either its original or modified form, constitutes copyright infringement in violation of 17 U.S.C. § 501 *et seq.*

General first argues that, as a matter of law, Armstrong does not actually own the copyright to the logo.  This argument, although convoluted, can be quickly summarized.  In or about 2007, Armstrong retained a company called The Unleaded Group to assist it in creating a logo.  Both parties agreed and understood that Armstrong would own the copyright to the finished logo, although the parties never reduced that understanding to writing.  After the logo was completed, Armstrong, consistent with the parties' understanding, submitted the logo for

copyright registration in the name of Armstrong, identifying it as a work created for hire. General argues that, for various reasons, copyright in the work vested in its author, The Unleaded Group, and not in Armstrong.

The Court need not attempt to unravel the complex web that is General's argument or the equally complex web that is Armstrong's response; instead, it cuts bluntly through both. Assuming, for the moment, that General is correct that The Unleaded Group's creation of the logo cannot be considered a "work for hire" under 17 U.S.C. § 101(1) or (2), ownership of the copyright in that logo would thus initially vest in its author, The Unleaded Group. 17 U.S.C. § 201(a). However, it is undisputed that Armstrong and The Unleaded Group shared a mutual intention, at the time the logo was created, that The Unleaded Group would assign any rights it had in the logo to Armstrong upon completion of the project and Armstrong paying The Unleaded Group for the work. As Nancy Clark, The Unleaded Group's principal explained, "our process [was] you engage me, I do this for you, you pay me, you own it, and I am done with it." It is undisputed that Armstrong paid The Unleaded Group the amount the parties agreed upon, and thus, there is no reason to believe that The Unleaded Group did not orally transfer the copyright to Armstrong.

Although that assignment was not officially memorialized in writing until recently (and only in response to General's motion), nothing in the Copyright Act requires that assignments of rights secured by that Act to be in written form. 17 U.S.C. § 204(a) provides that "a transfer of copyright ownership . . . is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed." However, this provision has been broadly interpreted to permit effective oral assignments of copyrights, so long as the original owner ratifies or confirms that transfer in writing at some later

point in time. *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 827-30 (3d Cir. 2011) (collecting cases).[14] Armstrong and The Unleaded Group executed a Copyright Assignment Agreement on February 26, 2015, which "confirms the previous assignment to Armstrong of all of Unleaded's right, title and interest in [the logo]." This is sufficient to satisfy the statute and validate the effectiveness of the oral assignment from 2007. *Accord Barefoot*, 632 F.3d at 827 (finding written instrument affirming oral assignment executed nine years after the alleged assignment and four years after the lawsuit at issue was commenced was sufficient).

General argues that Armstrong cannot rely upon a theory that it acquired the copyright in the logo via assignment from The Unleaded Group when the Certificate of Registration for that logo indicates that Armstrong's rights were secured because the logo was a "work for hire." Errors in a Certificate of Registration do not invalidate the certificate or the rights secured in the certificated owner absent a showing of intent to defraud and prejudice. *In re Napster Copyright Litigation*, 191 F.Supp.2d 1087, 1099 (N.D.Ca. 2002). General does not attempt to make such a showing.

Accordingly, the Court rejects General's argument that Armstrong is not the proper owner of the copyright in the shield logo. Thus, the Court turns to General's remaining arguments.

General argues that its use of the "FRAUDULENT STEEL" logo is protected by the doctrine of "fair use," because General's use was for the purpose of "comment and criticism." 17 U.S.C. § 107. The "fair use" doctrine permits persons to make use of a copyrighted work "for

---

[14]     The Ninth Circuit appears to hold a minority position, requiring that the writing be "executed more or less contemporaneously with the agreement." *Koningsberg, Intl. v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994). But even within the 9th Circuit, that position is far from universally-adopted. *See Magnuson v. Video Yesteryear,* 85 F.3d 1424 (9th Cir. 1996) (finding 14-year delay between oral and written assignment sufficient to satisfy the statute).

purposes such as criticism, comment, news reporting, teaching . . ., scholarship, or research." *Id.* To determine whether a party's use of a copyrighted work is a "fair use," the statute requires the Court to consider four factors: (i) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (ii) the nature of the copyrighted work; (iii) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (iv) the effect of the use upon the potential market value of the copyrighted work. *Id.*

The Court cannot find that, as a matter of law, that General's use of the "FRAUDULENT STEEL" mark is a fair use of Armstrong's logo. General used most of the elements of Armstrong's mark – the shape, color, and graphical elements are essentially identical between Armstrong logo and General's version of it, as is the use of the word "steel." Although General characterizes the purpose of its use of the logo as being for "comment and criticism," its use of the mark was not to comment or criticize <u>the mark</u> itself. Rather, General's use was for the explicitly commercial purpose of convincing prospective customers of Armstrong to instead patronize General. Under these circumstances, General's use of the mark was not "fair use" under the statute. *See generally Hill v. Public Advocate of the United States*, 35 F.Supp.2d 1347, 1358-60 (D.Colo. 2014) (analyzing factors).

Finally, General argues that, with regard to the advertisement that used Armstrong's actual logo but pointed to General's website, that advertisement appeared on a website created by JEMSU and that General had no control over that advertisement. For the reasons discussed above, the Court declines to grant summary judgment to General based on an argument that it cannot be held liable for tortious acts committed on its behalf by JEMSU.

34

Accordingly, the Court denies General's motion for summary judgment on the copyright counterclaims against it.

### 3. Armstrong's motion

Armstrong moves for summary judgment on all of the claims that General has asserted against it.

#### a. False advertising

General asserts its own Lanham Act false advertising claim against Armstrong, stemming from Armstrong's alleged operation of the website www.steelbuildingcomplaints.com (hereafter, "the website").[15]  That website contains material critical of General's products and practices.[16]

---

[15]     As the Court understands it, General's false advertising claim relates solely to Armstrong's www.steelbuildingcomplaints.com website.  Put differently, the Court does not understand   General to assert a false advertising claim based on the contents of the earlier www.generalsteelscam.com website, and that General's frequent references to that earlier site are for purposes of historical context and comparison.   The Court derives this conclusion from a review of General's Amended Complaint.  The description of the false advertising claim there expressly refers to and extensively quotes from the steelbuildingcomplaints.com website, but makes no mention, directly or indirectly, of the generalsteelscam.com website.  *See* Docket # 101, ¶ 47.

[16]     The Court is compelled to remark that the presentation of facts and argument in both sides' motion papers is particularly unhelpful.  Armstrong derives its list of alleged false representations from General's Complaint, not from any narrowing or clarification of those allegations in discovery.  As a result, Armstrong argues that General alleges that a "false or misleading representation" in the website is that "the website contains materially false information about General Steel and its past and present employees."  That is a description of a representation, not the representation itself.  Likewise, Armstrong lists "the website falsely portrays old, closed, and resolved disputes as legitimate and current complaints" as a "false representation" asserted by General, rather than investigating the factual basis for that assertion in discovery and identifying the specific "current complaints" recited in the website that General contents are "old, closed, and resolved."

General's response does not materially clarify matters.  Rather than specifically and precisely itemizing each and every representation it relies upon – as a plaintiff should be able to do at the end of discovery -- General simply takes Armstrong's lead and offers terse responses that often consist of little more than a citation to an affidavit that often addresses the alleged representation only obliquely.  For example, in response to Armstrong's argument that General cannot prove that it falsely represented old complaints as current, the affidavit that General

Among the statements made by the website that General contends are false are: (i) statements to the effect that the website is "by consumers for consumers" and that the many of the contents therein are statements by actual General customers, when in fact the website and its contents as being solely or predominantly created by Armstrong; (ii) that it misrepresents old and resolved customer complaints against General as current complaints; (iii) that General has disregarded court orders issued in other cases; (iv) mentions alleged ongoing investigations of General by state Attorney General officers and a "pending class action law suit" against General; and (v) numerous allegations to the effect that General conspires with arbitrators to ensure that complaints against General that go to arbitration hearings are resolved in General's favor, or other comments suggesting that General abuses the arbitration process.  General also contends that Armstrong sends out letters under the guise of a "Consumer Advocacy Alliance"  that contain false statements, both in the sense that the letters mislead customers as to the identity of the organization sending out the letters and that they letters falsely state that General was involved in a court trial in October 2012.  And General contends that Armstrong sales employees made telephone calls to General's customers, falsely claiming to be calling from a governmental agency.

Armstrong first argues that none of the content on the website is "false," either literally so or by implication. General's response to this contention focuses largely on proving that, contrary to the website's assertion that it is "by consumers," Mr. Chumley is the primary, if not exclusive, moving force behind the website and its contents.  The Court will not recite or attempt to summarize the complex chain of evidence and inferences upon which General relies.  It is

---

responds with merely states that a <u>different</u> website "contained multiple 'complaints' listed under **Recent Complaints** and posts dates such as 'June 08' without the year.  [Mr.] Chumley admitted at his deposition that he posted these multiple complaints."

sufficient to observe that there is ample evidence from which a reasonable factfinder could infer that Mr. Chumley is the author of much of the content of the website.  From that conclusion, the factfinder could also infer that the various representations on the website that suggest that the website is created "by consumers" or that it is intended to be a resource for consumers is false.[17]

The remainder of General's response to Armstrong's argument that the remaining contentions are not false or misleading is more awkward.  With regard to many of the allegations, General cites to an affidavit by Mr. Knight that discusses content posted on a different website (www.generalsteelscam.com) that is not at issue in this lawsuit and the contents of which is different from those in www.steelbuildingcomplaints.com.  When Mr. Knight's affidavit addresses specific content on steelbuildingcomplaints.com, it merely quotes from the website and asserts the bare conclusion that such material is "false and outrageous".  The affidavit offers no explanation of what portion of the quoted statement is false or why.  For example, the website states that "General Steel employees [have stated] that they too are growing tired of the lies.  Daily sales meetings have been referred to as 'daily indoctrination.'"  This Mr. Knight states is "false and outrageous", but he is in no apparent position to assert that "General Steel employees have stated that they . . . are growing tired of the lies" is false unless he has personal knowledge of every communication that every General employee (past and present, presumably) has had with third parties.  Another example found in Mr. Knight's affidavit is that the statement that there have been "dozens and dozens of lawsuits involving transactions with

---

[17]      This finding also disposes of Armstrong's argument that, if it does own or control the website, it is entitled to the benefits of the safe harbor provisions of the Communications Decency Act, 47 U.S.C. § 230(c)(1), which protects website owners from liability for material that others post on it.  That safe harbor does not apply to website owners who also publish content on the site.  *Id.*  Because there is a genuine dispute of fact as to whether Mr. Chumley posted some or all of the content on the website, Armstrong is not entitled to summary judgment on this defense.

General Steel" as is false.  The affidavit does not state Mr. Knight's knowledge or the <u>actual</u> number of lawsuits that were filed by customers.

Because neither party has attempted to specifically corral either the specific false statements or the nature of the false representation that are the subject of General's false advertising claim, the Court will not attempt to do so here.  It is sufficient to observe that there is sufficient evidence that at least <u>some</u> of the listed statements are false, literally or by implication, and that is sufficient to permit the Court to deny Armstrong's summary judgment motion on this point.  This is sufficient to proceed to trial.  However, the parties are advised that the Court will require that, in the Proposed Pretrial Order, both sides' articulations of their false advertising claims must supply <u>pinpoint-precise</u> identification (verbatim, in most cases) of each and every allegedly false statement that party will rely upon, as well as precisely identify the specific evidence that the party asserting the false advertising claim will produce to demonstrate that falsity.  The Court will not schedule a trial with such precision, nor will it permit a party to assert at trial an allegedly false statement that was not identified in the Pretrial Order.

Armstrong's second argument directed at the false advertising claim is that even if the material posted on the website was posted by Armstrong and was factually untrue, Armstrong can nevertheless not be held liable for it because the statements are not "advertising or promotion."  Armstrong instead describes the content as being that of a "gripe site" or "complaint site" that is non-commercial speech.  This argument might have merit if Armstrong were not a direct competitor of General; in such circumstances, Armstrong's criticism of General would be divorced from the goods and services it offered for sale and unmotivated by any commercial interest.  *Compare Utah Lighthouse Ministry v. Foundation for Apologetic Information and Research*, 527 F.3d 1045, 1052-53 (10th Cir. 2008) (non-commercial website

that parodied plaintiff's website was not "advertising," even though parties were, to a limited degree, competitors in the same market).  However, Armstrong's strong commercial interest in diverting customers away from General (in the hopes that some of them might instead purchase a similar product from Armstrong) and its specific reference to General's products in the website are sufficient to subject Armstrong to liability for false advertising for misrepresentations contained in the website.

This case is more akin to *Haugen*, in which an Amway distributor disseminated a message to other distributors that falsely accused the Proctor & Gamble Company – an Amway competitor -- of being associated with Satanism and encouraged recipient to avoid Proctor & Gamble's products.  A single sentence of the multi-paragraph message contained an oblique reference promoting Amway, stating merely that "it really makes you count your blessings to have available to all of us a business that allows us to buy all the products that we want from our own shelf."  Proctor & Gamble sued Haugen for false advertising under the Lanham Act and Haugen argued, among other things, that the message was not commercial speech, but the 10th Circuit disagreed, finding that the economic motivation behind the message and its specific focus on a particular competing brand and its encouragement of a boycott, coupled with the vague encouragement to continue buying Amway products, rendered the communication commercial in nature.  *Id.*  Here, although it is not entirely clear whether the website ever encouraged consumers to investigate General's competitors – such as Armstrong – this Court is unpersuaded that the absence of such an suggestion rescues Armstrong from liability.  It is apparent that the website was purposefully directed at putative consumers of General, that it was intended to discourage those persons from patronizing General in particular (although not to discourage them from purchasing a steel building), and, at least implicitly, encouraging them to purchase from a

different seller of buildings instead.   In the circumstances presented here, this is sufficient to constitute commercial advertising for purposes of the Lanham Act.

Armstrong also argues that General cannot show that the false representations on the website actually deceive customers or have a likelihood of doing so.  The Court need not explore this argument deeply, as it is readily-apparent that, in the light most favorable to General, the content of the website could be likely to deceive customers.  The website purports to be a collection of complaints posted by customers, when, in fact, it is posted by a competitor of General's for the purpose of discouraging putative customers from dealing with General. General asserts that the various complaints and other adverse representations on the site are false, which the Court generally credits for purposes of this argument.  The contents of the website relate directly to the quality of services provided by General and unambiguously describe those services as a "scam," and customers treating those complaints as accurate would be very likely to avoid dealing with General as a consequence.  This is not a circumstance where the false representations are orthogonal to the purpose for which customers would turn to the website for information, such that they would not be likely affect a purchasing decision, or a circumstance in which the representations are so inconsequential or hyperbolic that reasonable consumers would reflexively reject or ignore them.

Finally, Armstrong argues that General's false advertising claim is barred by the doctrine of *res judicata*.  In 2010, General commenced suit against Armstrong in D.C. Colo. Civ. Case No. 10cv-1398-PAB-KLM.  General's Amended Complaint in that action focused on Armstrong making unlawful use of General's name by using the term "general steel buildings" as keywords when purchasing pay-per-click and other types of online advertising, that Armstrong made false representations about its own business on its website (such as that it fabricated its own steel).

Based on this conduct, General asserted various claims against Armstrong, including false advertising under the Lanham Act. Judge Brimmer conducted a bench trial in July 2012 and in May 2013, found in favor of General on its false advertising claims and awarded damages and a disgorgement remedy against Armstrong. Although none of General's claims involved either the generalsteelscam.com or steelbuildingcomplaints.com websites directly, General put on some evidence at trial concerning generalsteelscam.com and Judge Brimmer made certain findings with regard to that site. He found that Mr. Chumley denied operating the site but admitted to "submitting large amounts of content to it," that the evidence at trial "did not establish that [the site's content] was false," that Mr. Chumley's activities on the site indicated that "Mr. Chumley was committed to damaging the reputation of General Steel," that Mr. Chumley had authored and posted articles on the internet about the steel building industry that purported to have been written by a "Jeff Knight," "Jeffery Knight," or "Nathan Wright" (Mr. Knight and Mr. Wright being officers of General), and that the articles indicated that the Jeffrey Knight in question was the webmaster of generalsteelscam.com.

*Res judicata* precludes litigation of issues that were actually decided or could have been decided in a prior action. *Santana v. City of Tulsa*, 359 F.3d 1241, 1246 n. 3 (10th Cir. 2004). It applies where: (i) the prior suit resulted in a final judgment on the merits; (ii) the same parties were involved in both suits; and (iii) the same cause of action is pressed in both suits. *Id.* To determine whether the same cause of action is at issue in both cases, the Court looks to "all claims or legal theories that arise from the same transaction, event, or occurrence," applying a pragmatic test that "giv[es] weight to such considerations as whether the facts are related in time, space, origin, or motivation, and whether they form a convenient trial unit." *Wilkes v. Wyoming Dept. of Employment*, 314 F.3d 501, 504 (10th Cir. 2002).

Under this standard, the Court finds that false advertising contained in steelbuildingcomplaints.com cannot possibly have been part of the same transaction, event, or occurrence being litigated before Judge Brimmer.  The claims before Judge Brimmer focused on Armstrong boasting of false accomplishments on its own website and falsely appropriating General's name in pay-per-click advertisements; those claims had no necessary connection to Armstrong making websites that falsely disparaged General.  Moreover, it is clear that the steelbuildingcomplaints.com site only came into existence in or about March 2012, only months before the case was tried to Judge Brimmer, and long after the deadline for amending pleadings and adding claims.  (Indeed, it is not even clear that the generalsteelscam.com site existed, much less that General was aware of it, prior to the deadline for joining claims in the Judge Brimmer suit.)  Although General put on some evidence of the generalsteelscam.com website during trial, it was apparently for the purpose of collaterally demonstrating Mr. Chumley's intent to harm General, not because the existence or content of that website was essential to establishing one or more of General's claims in that suit.  Under these circumstances, the Court finds that General's current false advertising claim is not barred by *res judicata*[18].

Accordingly, the Court denies Armstrong's motion for summary judgment on the false advertising claim.

### b. Anti-cybersquatting Consumer Protection Act

The Anti-cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1)(A), provides civil liability for a person who "registers, traffics in, or uses a domain name that is . . . identical or confusingly similar to" a mark owned by another, if the person using that domain name "has a

---

[18] The Court does not address, however, whether any factual issues were resolved in the prior action so as to preclude there relitigation here by application of the doctrine of collateral *estoppel.*

bad faith intent to profit from that mark."  Thus, General must show that: (i) generalsteelscam.com is "confusingly similar" to General's trademark in the words GENERAL STEEL; (ii) that Armstrong registered in or used generalsteelscam.com; and (iii) that Armstrong did so with a bad faith intent to profit from that name.  Armstrong argues that General cannot show that Armstrong (as opposed to PRQ and Mr. Swartholm) actually used the generalsteelscam.com domain name and cannot show that the domain name is confusingly similar to General's mark.[19]  The Court quickly disposes of the former argument; as discussed above, there is sufficient evidence to find that Mr. Chumley is the beneficial owner of the domain name, even if it is nominally registered in the name of PRQ and Mr. Swartholm – *i.e.* that he is their "authorized licensee."  *See* 15 U.S.C. § 1125(d)(1)(D).

Turning to the question of whether generalsteelscam.com is "confusingly similar" to the GENERAL STEEL mark, courts have generally recognized that domain names that consist of a given mark plus a disparaging suffix – *e.g.* walmartsucks.com, applestinks.com – rarely meet the "confusingly similar" test.  *Taubman Co. v. Webfeats*, 319 F.3d 770, 777-78 (6th Cir. 2003); *Lucent Technologies, Inc. v. Lucentsucks.com*, 95 F.Supp.2d 528, 534 (E.D.Va. 2000); *Bally Total Fitness Holding Corp. v. Faber*, 29 F.Supp.2d 1161, 1164 (C.D.Ca. 1998).

General responds that the World Intellectual Property Organization ("WIPO"), an international tribunal set up to resolve disputes over internet domain names, found to the contrary, ruling in General's favor in March 2012 and requiring that the generalsteelscam.com domain be tuned over to General.  The WIPO panel explained that, in its view, affixing a disparaging suffix "does not serve sufficiently to diminish the confusing similarity between the trademark and the disputed domain name."  At least one federal circuit has described WIPO

---

[19]  Armstrong also argues that the proceedings before Judge Brimmer should operate as *res judicata* on this claim.  The Court rejects that arguments for the reasons discussed above.

proceedings as "adjudication lite" with "loose rules regarding applicable law" that "make [ ] no

effort at unifying the law of trademarks among the nations served by the internet."

*Barcelona.com Inc. v. Excelentismo Ayuntamiento De Barcelona*, 330 F.3d 617, 624-25 (4th Cir.

2003).  As such, WIPO findings are "not given any deference" in a case under the Anti-

cybersquatting Act.  *Id.* at 626 (emphasis in original); *see also Sallen v. Corintians*

*Licenciamentos LTDA*, 273 F.3d 14, 28 (1st Cir. 2001) ("a federal court's interpretation of the

[Act] supplants a WIPO panel's interpretation").  Accordingly, this Court does not defer to the

WIPO panel's findings, but rather, follows the general trend in the U.S. courts that decline to

find disparaging domain names to be confusingly similar to the marks they incorporate.  Thus,

Armstrong is entitled to summary judgment on General's Anti-cybersquatting Act claim.

### c. Libel

Armstrong seeks summary judgment on this claim by incorporating arguments it has

made above – *i.e.* that General cannot show any false statement, that it cannot show that

Armstrong published such a statement, and that it is protected by the "safe harbor" of the

Communications Decency Act.  Because the Court has resolved each of those arguments against

Armstrong above, it denies Armstrong's request for summary judgment on this claim.

### d. Unjust enrichment

Armstrong's motion offers only a perfunctory argument on this claim, stating simply that

General cannot demonstrate "whether Armstrong received any benefit at General Steel's

expense."  It does not attempt to marshal the existing evidence or point to any specific

allegations by General defining the contours of the claim.  This is insufficient to carry

Armstrong's initial burden, as a summary judgment movant alleging that a particular fact cannot

be disputed, of "citing to particular parts of materials in the record" demonstrating that

proposition.  Fed. R. Civ. P. 56(c)(1).  Accordingly, the Court will not consider this argument further.

### e.   Civil conspiracy

Armstrong offers an equally abbreviated argument on this point, stating only that General cannot demonstrate "that there was a meeting of the minds between alleged co-conspirators Armstrong, PRQ, and Swartholm," nor any of the other elements of conspiracy.  (It does assert that General "conducted extensive discovery of Mr. Chumley and Armstrong, including their bank accounts and email communications, which turned up no evidence whatsoever regarding a connection between the Swedish registrant and Armstrong or Mr. Chumley.")  Although the Court has doubts that this suffices to discharge Armstrong's obligations as a movant under Rule 56(c)(1), it will assume that Armstrong is essentially asserting that there is no cogent evidence of any kind for it to point to on this claim.

The Court then turns to General's response.  General offers only the assertion that Mr. Swartholm is a "notorious computer pirate" and is known to "host practically anyone['s website]."  That may be true, but it fails to suffice to satisfy General's obligation to demonstrate the existence of an agreement between Mr. Swartholm and Armstrong to accomplish some unlawful objective here.  Absent a showing that Mr. Swartholm knew or should have known that the contents of steelbuildingcomplaints.com were false and defamatory towards General when he agreed to host it, General cannot show a meeting of culpable minds that is the central element of a claim of civil conspiracy.  Accordingly, Armstrong is entitled to summary judgment on General's claim of civil conspiracy.

f. Misappropriation of trade secrets

General contends that Mr. Chumley accessed computers belonging to one of General's suppliers, obtaining a copy of General's customer database. General hypothesizes that Lisa Chavez, a former General employee who left General to work for Armstrong, likely provided Mr. Chumley with the necessary login and password. However, the only evidence that General provides to support this contention is testimony form Mr. Knight and from David Rutherford, an official with General's supplier, both presenting that supposition. But supposition is not evidence. General does not purport to have evidence that, for example, a copy of the customer database was found on Mr. Chumley's computer or on a desk at Armstrong; that any witness has testified based on personal knowledge that they saw Mr. Chumley in actual possession of the database in some manner (or that Ms. Chavez confirmed assisting Mr. Chumley in the manner described); that customers of General have been contacted by Armstrong and told that Armstrong obtained their contact information from General's database; or any of the various ways that one would produce actual facts that would validate a mere supposition. Because General has not come forward with any meaningful proof of this claim, Armstrong is entitled to summary judgment on it.

Accordingly, Armstrong's motion for summary judgment is granted with regard to the Anti-cybersquatting Act, civil conspiracy, and misappropriation of trade secrets claims, and denied with regard to the false advertising, libel, and unjust enrichment claims.

**C. Motion to restrict access**

General moves to have Exhibits 29 through 33 to its reply in support of its summary judgment motion **(# 507)** placed under a Level 1 restriction. The motion is unopposed.

The Supreme Court acknowledged a common law right of access to judicial records in *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978). This right is premised upon the recognition that public monitoring of the courts fosters important values such as respect for the legal system. *See In re Providence Journal Co.*, 293 F.3d 1, 9 (1st Cir. 2002). Judges have a responsibility to avoid secrecy in court proceedings because "secret court proceedings are anathema to a free society." *M.M. v. Zavaras*, 939 F.Supp. 799, 801 (D.Colo. 1996). There is a presumption that documents essential to the judicial process are to be available to the public, but they may be sealed when the public's right of access is outweighed by interests which favor nondisclosure. *See United States v. McVeigh*, 119 F.3d 806, 811 (10th Cir.1997). Such a showing is required to ensure public confidence in the judicial process. It is critical that the public be able to review the factual basis of this Court's decisions and evaluate the Court's rationale so that it may be confident that the Court is functioning as a neutral arbiter. *Id*. at 814.

D.C. Colo. L. Civ. R. 7.2(B) imposes specific showings that a party seeking to restrict public access to a filed document must make: (i) a showing that "the interest to be protected ... outweighs the presumption of public access"; (ii) identification of "a clearly defined and serious injury that would result if access is not restricted"; and (iii) an explanation why "no alternative to restricted access [such as redaction or summarization, among other things] will adequately protect the interest in question." In addition, the rule makes clear that "stipulations between the parties and stipulated protective orders with regard to discover, alone, are insufficient to justify restricted access." D.C. Colo. L. Civ. P. 7.2(B)(2).

Here, General seeks to restrict access to five exhibits to Docket # 507. Exhibit 29 is identified as JEMSU's contract with General for search engine optimization services, which has already been partially redacted. Exhibit 30 is a 13-page (substantive pages) excerpt from Mr.

McCain's deposition.  Exhibit 31 is a one-page excerpt from Mr. Knight's deposition.  Exhibit 32 is a January 13, 2014 2-page letter on General's letterhead from Mr. McCain to Mr. Olson, instructing Mr. Olson to remove materials on JEMSU's websites.  Exhibit 33 is a two-page excerpt from Mr. McCain's deposition.

As to the three deposition excerpts, General argues that restricted access is justified simply because these depositions were "previously designated [by General] as Attorney's Eyes Only and/or Confidential."  As noted in Local Rule 7.2(B)(2), designation of an exhibit as confidential under a Protective Order is not, of itself, a sufficient basis for restricted access.  General's motion does not elaborate on the reasons for that designation, identify the particular portions of the deposition that constitute sensitive material, explain that harm that could arise upon public disclosure, or explain what alternative means such as redaction or summarization could not substitute for restricted access.  *See* Local Rule 7.2(B).  The Court has independently reviewed each of the excerpts and sees nothing therein that would appear to warrant restricted access.  Accordingly, the motion is denied with regard to these exhibits.

As to the JEMSU contract and the letter to Mr. Olson, General argues that these exhibits should be restricted "to preclude Armstrong from discerning details of [JEMSU's] advertising and marketing strategies for General Steel."  (It acknowledges that General has since ceased working with JEMSU, but contends that the strategies reflected in the documents remain "proprietary" and posits that General may be using similar strategies with a different company.)  General states that if Armstrong obtained the records "there would [be] nothing preventing Armstrong form retrieving the documents and manipulating them is some fashion to its benefit and General Steel's detriment," although it does not elaborate.

General's assertions notwithstanding, the JEMSU contract does not appear to reveal any meaningful confidential information.  It reflects that, for a three-month period in 2012, JEMSU was providing three types of services for General: "on-going SEO," "Pay-per-click management," and "web development."  None of these activities seem to be unusual for customers of the search engine optimization industry to be performing or particular unique or sensitive.  All sensitive information – prices for each service, web passwords, specific keywords to be targeted, are already redacted.  The Court sees nothing in this document that would reveal any meaningful strategies, disclose the identities of any persons not already identified in this Order, or reveal any passwords or other confidential information.  General's abstract fear that Armstrong could make some nefarious use of the information contained in the document seems to be unfounded.  The same is true with regard to Mr. McCain's letter to Mr. Olson: this Court's Order essentially recites all of the meaningful points addressed in the letter, and it is difficult to see how public disclosure of the letter itself could work any harm on General.  Accordingly, given the strong public interest in access to judicial records, the Court denies the motion and directs that these documents be publicly-filed.

## CONCLUSION

For the foregoing reasons, Armstrong's Objections **(# 336)** are **OVERRULED**.  The Court **AFFIRMS**  the Magistrate Judge's July 30, 2014 Minute Order **(# 306)** denying in part Armstrong's Motions to Compel.  General's Motion for Summary Judgment **(# 486, 490)** and Armstrong's Motion for Summary Judgment  **(# 488)** are **GRANTED IN PART** and **DENIED IN PART** as set forth herein.  General's Motion to Restrict Access **(# 516)** is **DENIED** and the Clerk of the Court shall lift all restrictions on Docket # 507-1 through 507-5.

Dispositive motions having been resolved, all that remains is to prepare the case for trial. The parties shall promptly begin preparation of a Proposed Pretrial Order in accordance with the Trial Preparation Order (**# 158**) and shall jointly contact chambers to schedule a Pretrial Conference within 14 days.

Dated this 15th day of September, 2015.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge